UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| JOSEPH P. O'LEARY, | ) | |
| Plaintiff, | ) | FILED: MARCH 6, 2009 |
| | ) | Case No. 09CV1428 |
| | ) | JUDGE CONLON |
| | ) | MAGISTRATE JUDGE MASON |
| HEALTHCARE SERVICES, INC., d/b/a | ) | BR |
| ACCRETIVE HEALTH and MARY | ) | |
| TOLAN, | ) | |
| Defendants. | ) | Jury Trial Demanded |

## COMPLAINT

Plaintiff, Joseph P. O'Leary ("O'Leary"), by and through his counsel, for his complaint against defendants Healthcare Services, Inc., d/b/a Accretive Health ("Accretive"), and Mary Tolan ("Tolan"), alleges as follows:

### Nature of the Action

1. O'Leary is a former senior vice president of Accretive.

2. O'Leary worked for Accretive from approximately February 2005 until January 2, 2007, when Accretive and Tolan, in violation of Title VII, wrongfully terminated his employment in retaliation for O'Leary's reporting of conduct he believed violated Title VII.

3. Tolan tortiously interfered with O'Leary's employment relationship with Accretive by wrongfully terminating him.

4. In or about October 2006 O'Leary reported to Accretive and Tolan conduct he believed constituted sexual harassment and racial discrimination by an Accretive employee. In response to O'Leary's report of conduct he believed violated

1

Title VII, instead of conducting a proper investigation and following up on O'Leary's report, Tolan and Accretive decided to terminate O'Leary and deprive him of valuable compensation, including but not limited to his annual bonus he earned in 2006 and his shares of stock.

5.  O'Leary now seeks the compensation he was unreasonably denied by Accretive.

## Parties

6.  Plaintiff O'Leary is a former employee of Accretive who resides in this District.

7.  Accretive is a Delaware corporation with its principal place of business in Chicago, Illinois.

8.  Accretive is a built-for-purpose entity formed in 2003 to provide revenue cycle business process outsourcing, or BPO, services for hospitals. Accretive is an employer subject to Title VII.

9.  Tolan is the chief executive officer of Accretive.

## Jurisdiction and Venue

10. This Court has jurisdiction pursuant to the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3, and 28 U.S.C. §§ 1331, 1337.

11. Venue is proper in this District pursuant to 28 U.S.C. § 1441.

## O'Leary's Employment Agreement with Accretive

12. Accretive recruited and induced O'Leary to leave his prior employment with Bearing Point to join Accretive in February 2005 based on the terms and conditions set forth in O'Leary's offer of employment letter.

13.  Among other things, in the offer of employment letter, Accretive granted O'Leary "Options to acquire 166,667 shares of Accretive stock pursuant to the terms and conditions established for the Accretive Health Employee Stock Option Plan." No "Accretive Health Employee Stock Option Plan" existed in February 2005.

14.  Accretive also promised that one-fourth of O'Leary's options vested on each January 1 following his hire date in February 2005. Thus, one-fourth vested on January 1, 2006, one-fourth vested on January 1, 2007, one-fourth vested on January 1, 2008, and one-fourth vested on January 1, 2009.

15.  O'Leary accepted the offer of employment and executed the employment agreement.

16.  O'Leary agreed to accept the offer of employment in exchange for a lower total annual compensation amount of $400,000, consisting of $275,000 in salary and $125,000 in bonus compensation, which was substantially less than the total annual salary and bonus compensation he was earning at his prior employment, only because Accretive also offered O'Leary 1% ownership in Accretive in the form of the options to acquire 166,667 shares of Accretive stock.

17.  O'Leary commenced employment with Accretive in or about February 2005.

18.  The agreed-upon strike price of O'Leary's options was $1.12 per share.

19.  In or about March 2006, O'Leary exercised all of his options at the earliest possible date, one-fourth of which had vested on or about January 1, 2006.

20. Senior management of Accretive encouraged O'Leary to exercise all of his options in March 2006. Accordingly, O'Leary paid Accretive in March 2006 to acquire all of his options for a total of 166,667 shares.

21. On or about December 29, 2005, Accretive's board of directors adopted the Stock Option Plan. Accretive purported to backdate the Stock Option Plan to attempt to make it effective as of December 1, 2003.

22. Accretive first provided a copy of the Stock Option Plan to O'Leary on or about January 5, 2006.

23. O'Leary performed all of his obligations pursuant to his employment agreement with Accretive.

## COUNT I – VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, AS AMENDED

24. O'Leary realleges the allegations contained in paragraphs 1 through 23 as if fully set forth herein.

25. Accretive's business involved entering into long-term contracts to assume the entire revenue cycle function at hospital systems. In 2005 Accretive's sole client was Ascension Hospital System, a system of Catholic-based hospitals in Michigan.

26. O'Leary was hired to oversee and manage Accretive's revenue cycle operations at the Ascension hospitals in "Greater Michigan" – i.e., all Ascension hospitals outside the Detroit metropolitan area. O'Leary spent the first few months at Accretive assisting another senior vice president in managing the Greater Michigan operations while O'Leary learned about the hospital revenue cycle processes. By

4

approximately the summer of 2005, O'Leary had become the primary person in charge of operations for the Greater Michigan area.

27. As the person in charge of operations for the Greater Michigan area, O'Leary traveled nearly every week to various Ascension hospitals in Michigan, meeting with staff and overseeing the operations. Each hospital was assigned a specific site director to manage the employees on a day-to-day basis. The site director was responsible for traveling to and working the particular hospital to which the site director was assigned. The site directors reported to O'Leary.

28. Accretive employee Rhonda Miller ("Miller") was assigned to be site director for St. Mary's Hospital in Saginaw, Michigan by September 2006. As site director, Miller reported to O'Leary.

29. O'Leary observed Miller's treatment of Miller's subordinate employees. O'Leary observed that Miller harassed, bullied and mistreated African American employees. Based on O'Leary's observations and discussions with Miller, O'Leary believed Miller was a racist.

30. O'Leary reported racial discrimination and sexual harassment by Miller to Tolan and others at Accretive.

31. In October 2006 a subordinate reported to O'Leary that Miller had made inappropriate statements to subordinate employees at a work dinner attended by several Accretive employees. Specifically, Miller reportedly bragged to her subordinate employees that she had had sexual relationships with four senior Accretive executives. She also reportedly told the group, including one male subordinate employee, who was

5

approximately 23 years old, that she preferred to have sex with 23-year-olds because they were more her speed.

32. The 23-year-old male subordinate employee reported this incident to his superior, who in turn reported it to O'Leary. O'Leary reported the incident to his superior, Executive Vice President Etienne Deffarges ("Deffarges").

33. Deffarges told O'Leary to report the incident to Accretive's Chief Executive Officer, Tolan. Deffarges told O'Leary that ordinarily Deffarges would advise O'Leary to report the incident to Accretive's general counsel, Greg Kazarian ("Kazarian"), but Deffarges stated that because it was widely believed at Accretive that Kazarian was one of the Accretive executives who had a sexual relationship with Miller, Deffarges advised O'Leary not to report the incident regarding Miller to Kazarian but rather directly to CEO Tolan.

34. Accordingly, O'Leary scheduled a meeting with Tolan on October 23, 2006, and reported the incident to Tolan at that time.

35. Tolan responded to O'Leary's report by stating that Kazarian was the type to have an affair. O'Leary told Tolan that for the company's and Kazarian's sake, someone independent of Kazarian should investigate the matter to avoid the appearance of impropriety or bias in light of the allegations and rumors regarding Kazarian's sexual relationship with Miller.

36. O'Leary also reported to Tolan and others his concerns about mistreatment by Miller of African American employees who reported to Miller and about his concerns that Miller's conduct exposed Accretive to potential liability.

37. Shortly after reporting Miller's conduct to Tolan, O'Leary received a voicemail message from Kazarian stating that he was heading up the so-called "investigation" into Miller's conduct and that in the future, O'Leary should report any such matters directly to Kazarian.

38. O'Leary communicated his concern to Tolan that Kazarian's role in directing the investigation gave the appearance of impropriety and for the company's and Kazarian's sake, he recommended an independent investigation. Tolan did not respond to O'Leary's communication and Accretive ignored O'Leary's recommendation.

39. Tolan then subjected O'Leary to heightened scrutiny in his position at Accretive. For example, Tolan probed O'Leary's colleagues about O'Leary's performance and inquired how O'Leary spent his time. In December 2006 Tolan stated to O'Leary's colleagues that she had heard that O'Leary had bad-mouthed the company, asking them to confirm O'Leary had done so. O'Leary's colleagues told the truth and informed Tolan that they had never heard O'Leary bad-mouth the company.

40. Also in December 2006, Tolan scheduled a meeting with O'Leary at 5:00 p.m. on January 2, 2007. Tolan lied to O'Leary about the meeting, telling him the meeting was to discuss future plans, that she was meeting with O'Leary and all other senior executives, and that the meeting was to be attended only by Tolan and O'Leary.

41. In fact, Tolan had scheduled the meeting with O'Leary and Deffarges. Deffarges, who lived in San Francisco, had made arrangements to travel to Chicago for this meeting. Tolan did not schedule any meetings with other senior executives. The sole purpose of the meeting was to terminate O'Leary's employment and to attempt to intimidate him into executing a release of all potential claims against the company.

7

42. On January 2, 2007, Accretive terminated O'Leary's employment. That adverse employment action was in retaliation for O'Leary reporting conduct by Miller that he believed violated Title VII.

43. Upon termination, Accretive, as part of its retaliatory efforts, refused to pay any amount of the $125,000 annual bonus O'Leary earned in 2006, although Accretive had paid 100% of that bonus in 2005, on a pro-rata basis commencing with his February 2005 start date, and had paid O'Leary's peers and the subordinate employees he supervised 80% of their annual 2006 bonus. Also as part of its retaliatory efforts, Accretive did not timely provide O'Leary with federally required health insurance coverage information, refused to reimburse O'Leary for six months for business expenses he had incurred although Accretive had previously reimbursed such expenses without challenge within days of receiving O'Leary's expense reports, and made additional threats to O'Leary regarding the termination of his employment. Accretive also initially refused to pay O'Leary his last two days of wages earned in 2006.

44. Accretive improperly threatened to change the reason for O'Leary's termination to one for "Cause" if he did not sign a release.

45. O'Leary's reporting of what he believed to be discriminatory conduct is protected activity under Title VII.

46. Pursuant to Title VII of the Civil Rights Act of 1964, as amended, Accretive is liable for such retaliation against O'Leary as a result of his protected activity for compensatory and punitive damages and attorneys fees.

47. O'Leary timely filed a charge with the Equal Employment Opportunity Commission ("EEOC") on or about May 17, 2007. The EEOC mailed O'Leary a Notice

8

of Right to Sue dated February 9, 2009, a copy of which is attached hereto as Exhibit A, and O'Leary's Title VII claim is timely filed.

### COUNT II – CLAIM FOR UNPAID WAGES UNDER THE ILLINOIS WAGE PAYMENT AND COLLECTION ACT AND FOR ATTORNEYS FEES UNDER THE ILLINOIS ATTORNEYS FEES COLLECTION ACT

48. O'Leary realleges the allegations contained in paragraphs 1 through 47 as if fully set forth herein.

49. As part of his employment agreement, O'Leary agreed to accept a lower base salary amount provided that Accretive pay him an annual bonus sufficient to compensate him at the annual cash compensation rate of $400,000 per year and provided that Accretive award him stock options consisting of 1% ownership of the outstanding stock of Accretive.

50. Accretive failed to pay O'Leary any portion of his earned $125,000 bonus for 2006.

51. O'Leary has made a written demand on Accretive for the amounts owed.

52. Pursuant to the Illinois Wage Payment and Collection Act, 820 ILCS 115/5, O'Leary's 2006 bonus is wages owed by Accretive.

53. O'Leary is entitled to recovery of his attorneys fees and costs to collect these wages pursuant to the Attorneys Fees in Wage Actions Act, 705 ILCS 225/1, *et seq.*

### COUNT III – TORTIOUS INTERFERENCE WITH PROSPECTIVE RELATIONSHIP (AGAINST TOLAN)

54. O'Leary realleges the allegations contained in paragraphs 1 through 53 as if fully set forth herein.

9

55. As of October 23, 2006, O'Leary had a reasonable expectation to continue his employment relationship with Accretive through at least the end of the four-year period of the vesting of his stock options.

56. O'Leary's reasonable expectation was based upon his positive evaluations by his superiors, peers and subordinates, by the positive business results at the hospitals he was asked to focus his efforts on, by statements by the Accretive board of directors, and by his purchase of 100% of his stock options at the earliest possible date.

57. Tolan, acting solely with malice and intent to harm O'Leary, interfered with O'Leary's employment relationship with Accretive. Tolan acted with malice and utter disregard for O'Leary's rights.

58. Tolan purposefully interfered with O'Leary's legitimate expectation to continue working for Accretive by not responding properly to O'Leary's reporting of sexual and racial discrimination, by setting up a sham investigation into such reported conduct, by seeking, unsuccessfully, for a reason to terminate O'Leary, by subjecting O'Leary to heightened scrutiny, and by eventually terminating O'Leary's employment with Accretive based on false allegations.

59. As a direct result of Tolan's malicious acts, O'Leary has suffered damages by being terminated from his employment and by being deprived of the full value of his stock options and other compensation he would have earned at Accretive.

WHEREFORE, Plaintiff Joseph P. O'Leary respectfully requests that this Court enter judgment in his favor and against the Defendant Healthcare Services, Inc., d/b/a Accretive Health and Defendant Mary Tolan as follows:

A. That the Court order Defendants to pay O'Leary the wages owed under the Illinois Wage Payment and Collection Act, including O'Leary's 2006 bonus;

B. That the Court order Defendants to pay O'Leary all back pay with prejudgment interest, front pay, compensatory and punitive damages he is entitled to under Title VII of the Civil Rights Act of 1964, as amended, including but not limited to fair value for the Accretive stock O'Leary purchased and that would have vested if his employment had not been illegally terminated;

C. That the Court order Defendants to pay O'Leary his attorneys fees pursuant to Title VII of the Civil Rights Act of 1964, as amended, and/or the Attorneys Fees in Wage Actions Act;

D. That the Court grant such other and further relief as it deems equitable and such incidental relief, including O'Leary's costs and prejudgment interest.

DATED: March 5, 2009

Respectfully submitted,

_____
Nancy A. Temple, One of the
Attorneys for Plaintiff

Mitchell B. Katten
Nancy A. Temple
Katten & Temple LLP
542 S. Dearborn, Suite 610
Chicago, IL 60605
(312) 663-0800

11

Case: 1:09-cv-01428 Document #: 1 Filed: 03/06/09 Page 12 of 12 PageID #:12

EEOC Form 161-B (3/98)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

### NOTICE OF RIGHT TO SUE *(ISSUED ON REQUEST)*

To: Joseph O'Leary
2316 Orrington Avenue
Evanston, IL 60201

From: Chicago District Office
500 West Madison St
Suite 2000
Chicago, IL 60661

**CERTIFIED MAIL 7001 0360 0000 0469 4363**

[ ] *On behalf of person(s) aggrieved whose identity is CONFIDENTIAL (29 CFR §1601.7(a))*

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 440-2007-05037 | Kirsten J. Peters, Investigator | (312) 353-8900 |

*(See also the additional information enclosed with this form.)*

**NOTICE TO THE PERSON AGGRIEVED:**

**Title VII of the Civil Rights Act of 1964 and/or the Americans with Disabilities Act (ADA):** This is your Notice of Right to Sue, issued under Title VII and/or the ADA based on the above-numbered charge. It has been issued at your request. Your lawsuit under Title VII or the ADA **must be filed in a federal or state court WITHIN 90 DAYS of your receipt of this notice**; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a state claim may be different.)

[X] More than 180 days have passed since the filing of this charge.

[ ] Less than 180 days have passed since the filing of this charge, but I have determined that it is unlikely that the EEOC will be able to complete its administrative processing within 180 days from the filing of this charge.

[X] The EEOC is terminating its processing of this charge.

[ ] The EEOC will continue to process this charge.

**Age Discrimination in Employment Act (ADEA):** You may sue under the ADEA at any time from 60 days after the charge was filed until 90 days after you receive notice that we have completed action on the charge. In this regard, **the paragraph marked below applies to your case:**

[ ] The EEOC is closing your case. Therefore, your lawsuit under the ADEA **must be filed in federal or state court WITHIN 90 DAYS** of your receipt of this Notice. Otherwise, your right to sue based on the above-numbered charge will be lost.

[ ] The EEOC is continuing its handling of your ADEA case. However, if 60 days have passed since the filing of the charge, you may file suit in federal or state court under the ADEA at this time.

**Equal Pay Act (EPA):** You already have the right to sue under the EPA (filing an EEOC charge is not required.) EPA suits must be brought in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years) before you file suit may not be collectible.**

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission

*[signature]* John P. Rowe

2/9/09 (Date Mailed)

John P. Rowe,
**District Director**

Enclosures(s)

cc: HEALTHCARE SERVICES, INC. D/B/A ACCRETIVE HEALTH



EXHIBIT A